**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| E.H. and V.P.,<br><br>Plaintiffs,<br><br>v.<br><br>LIFELONG ADOPTIONS, INC.,<br><br>Defendant. | Case No. 1:25-cv-00441 JLT FJS<br><br>ORDER GRANTING MOTION TO DISMISS IN PART WITH LEAVE TO AMEND IN PART<br><br>(Doc. 19) |

The plaintiff in this case, who is using the initials "E.H." to protect her privacy, alleges that defendant LifeLong Adoptions, Inc., used tracking software to forward information about her pregnancy and her interest in an adoption to Google's and Facebook's parent companies (Alphabet, Inc. and Meta Platforms, Inc., respectively). She alleges the disclosure violated several state and federal laws. LifeLong moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Doc. 19) The motion is **GRANTED IN PART**, with leave to amend in part.

**ALLEGATIONS**

Because the case has come to the Court on a Rule 12(b)(6) motion, the Court must assume that E.H.'s factual allegations are true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). She alleges LifeLong operates a website for pregnant women who may be interested in putting their child up for adoption. (Doc. 19 at 4.) LifeLong uses the website to promote its services. (*See*

*id.*) Visitors can fill out an online form to request a consultation, start a phone consultation, download informational material, take a "Birthmother Communication Quiz," and "even review potential families that are looking to adopt a child." (*Id.*)

E.H. had an unplanned pregnancy in 2024. (*Id.* at 6.) She visited LifeLong's website and sent personal information about herself to the clinic through the website. (*See id.* at 2, 6.) After she visited the site, she says that she "began seeing targeted online advertisements for adoption services." (*Id.* at 6.) She did not know it at the time, but because she had logged into her Google and Facebook accounts before she visited the site, LifeLong had allowed Google and Facebook to "track her every move" while she was on its site. (*Id.*)

The complaint explains in some detail what happened, but not always clearly. In simplified terms, the complaint's theory is that Google and Facebook offer analytical software to people and companies who operate websites. (*See id.* at 9–10.) With the help of this software, website operators can better understand who is visiting and using their sites, they can test how effective their marketing efforts are, and they can reach new potential clients or customers, among other things. (*See id.*) In exchange for Google's and Facebook's permission to use their tools, website operators must allow those companies to collect data about the people who visit their site. (*See id.* at 9–11.) Google and Facebook then "aggregate the user information that they collect" from the many third party website operators who use their tools and create "advertising profiles" for the users whose data they collet. (*See id.* at 11–12.)

An advertising profile can include a great deal of personal information—so much, in fact, that Google's and Facebooks' tools allow website operators to target clients and customers using a wide variety of quite specific characteristics, such as "location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more." (*Id.*) Many different apps and businesses use Google's and Facebook's tools. Some of them collect intimate and potentially embarrassing information about their customers' and clients' lives and habits, such as pharmacies, mental health crisis centers, smoking cessation apps, depression management apps, and even pornographic websites. (*See id.* at 12–

13.) This means that an advertising profile could incorporate information that many people would likely consider to be quite sensitive, embarrassing, or private. (*See id.* at 12–13.)

The complaint refers to some of the tracking software at issue in this case as "pixels." (*Id.* at 15.) It describes pixels as a "small piece of code" within a website or ad that defines and collects information about its operator's "tracking goals." (*Id.*) Pixels can be difficult to find and block, and they "can collect a shocking amount of information" about a person's actions online, including by recording the addresses of the websites people visit, the amount of time they spend on those websites, the buttons or links they click, the search terms they use, the text they enter into a form, the things they add to an online shopping cart, and the purchases they ultimately make. (*Id.* at 16.)

Pixels can also interact with the "cookies" saved on a person's phone or computer to preserve information for later reference. (*See id.* at 17–18.) Google and Facebook use cookies to link a person's web browser to their Google or Facebook accounts, so they can often identify users who would otherwise remain anonymous. (*See id.* at 18.) Pixels can in this way track people and gather information about them as they move from one page to the next, even when they do not affirmatively disclose their identities by logging into a particular website or by entering their name or contact information into a form. (*See id.*)

LifeLong used Google and Facebook pixels on its website. (*Id.* at 21.) LifeLong also intentionally configured those pixels to collect and transmit information about E.H. (and others) to Google and Facebook. (*Id.*) For example, LifeLong elected to collect and transmit data showing whether visitors did the following:

- Filled out a form to request an adoption consultation
- Started a phone consultation about an unplanned pregnancy
- Submitted an application for adoption services
- Downloaded the "Ultimate Adoption Guide"
- Clicked an "I'm Pregnant" button
- Took a "Birthmother Communication Quiz"
- Looked at bios of families seeking to adopt a child

- Clicked an "I Like this Family!" button

(*See id.* at 21–33.) LifeLong did not warn E.H. or other visitors that it would send this information to Google or Facebook. (*See id.* at 34–35.) The pixels worked in the background, imperceptibly. (*See id.*) In fact, rather than offering a warning, LifeLong's privacy policy stated affirmatively that it did not share visitors' information "with any third party." (*Id.* at 33.) And according to the complaint—which, again, the Court must assume is true at this point—Google and Facebook then compensated LifeLong for transmitting this information by offering discounted or free services. (*Id.* at 35.)

E.H. filed her complaint against LifeLong in this case in April 2025. (Doc. 1.) She was originally joined by another plaintiff, V.P., who alleged that her experience on LifeLong's website was similar. (*See id.* at 1.) LifeLong then moved to dismiss the complaint under Rule 12(b)(6). (Doc. 13.) In response, E.H. and V.P. amended their complaint as a matter of course under Rule 15(a)(1)(B) (Doc. 19), and LifeLong renewed its motion (*See* Docs. 26, 27). That motion is now fully briefed. (*See* Docs. 31, 40.)

E.H. does not oppose the motion to dismiss several of her claims. (*See* Doc. 31 at 35 n.11.) Those claims are accordingly dismissed as withdrawn. In addition, after the reply was filed, the parties stipulated to V.P.'s dismissal as well. (*See* Docs. 48–49.) As a result, only the following claims by E.H. remain:

- A California common law claim for intrusion upon seclusion (No. 1)
- A California common law claim for breach of confidence (No. 2)
- A California common law claim for negligence (No. 4)
- An equitable claim for unjust enrichment (No. 6)
- A statutory claim under the federal Electronic Communications Privacy Act (ECPA) (No. 7)
- A constitutional privacy claim under Article I, section 1 of the California Constitutional (No. 8)
- A statutory claim under the California Invasion of Privacy Act (CIPA) (No. 12)

The Court determined that oral arguments would not be necessary and took the matter

under submission when briefing was complete. (Doc. 34.)

**STANDARD OF DECISION**

Federal Rule of Civil Procedure 12(b)(6) permits motions to dismiss for "failure to state a claim upon which relief can be granted." A Rule 12(b)(6) motion tests a complaint's "legal sufficiency," *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001), that is, whether it is based on "a cognizable legal theory" and includes "sufficient facts" to support that theory, *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). The district court's task is to decide whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This is a "context-specific task." *Id.* at 679. The court must draw on its "judicial experience and common sense," *id.*, and accept "all reasonable inferences in favor of the nonmoving party," *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)).

**DISCUSSION**

**I. Seclusion and Privacy (Claims 1 and 8)**

The parties each present their arguments about claim one (the common law claim for intrusion upon seclusion) and claim eight (the state constitutional privacy claim) in combined sections that address both claims together. (*See* Docs. 26 at 15; Doc. 31 at 15.) Courts often consider claims like these in conjunction because they are so similar. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) (citing *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 288 (2009)). The California Supreme Court has boiled down their "largely parallel elements" into two questions: (1) what was "the nature of any intrusion upon reasonable expectations of privacy"? (2) how offensive or serious was the intrusion, and was it justified? *See Hernandez*, 47 Cal. 4th at 288 (citing *Hill v. Nat'l Coll. Athletic Ass'n*, 7 Cal. 4th 1, 27 (1994)).

LifeLong argues that it did not intrude on E.H.'s privacy. (Doc. 26 at 15–16.) As LifeLong reads the complaint, E.H. alleges that she and LifeLong were on either side of a conversation of sorts. (*See id.*) Sensitive though their exchange may have been, it was an

intentional exchange nonetheless: E.H. intended for LifeLong to have the personal information she provided. (*See id.* at 16.) E.H. cannot be heard to complain that LifeLong "intruded" by receiving the information she voluntarily disclosed to it, or so the argument goes. (*See id.*)

At least one California federal district court has interpreted the state's privacy and seclusion law similarly. *Saedi v. SPD Swiss Precision Diagnostics GmbH*, No. 24-06525, 2025 WL 1141168, at *6–7 (C.D. Cal. Feb. 27, 2025). In addition to the commonsense notion that people "cannot logically intrude into communications to which they are a party," the district court cited "a handful" of orders by district courts in other states, applying those other states' laws. *See id.* at *7–8. These courts had likewise decided that when a plaintiff "voluntarily provides information to a defendant, there can be no 'intrusion' for purposes of an invasion of privacy claim." *Id.* (citing decisions by courts in Pennsylvania, Illinois, North Carolina, and Arizona).

E.H. dismisses the district court's order in *Saedi* as an "outlier." (Doc. 31 at 17.) By her research, "the vast majority of courts within this Circuit have found a cognizable invasion of privacy claim" in cases about a defendant's use of similar tracking tools. (*Id.* at *17–18.) It is not obvious, however, that the imbalance is so stark, nor that it is a product of persuasive reasoning by the majority camp. The order in *Saedi* was filed relatively recently, but at least two other district courts have agreed with its reasoning. *See Camm v. Reach Fin., LLC*, No. 25-1921, 2026 WL 861670, at *9 (S.D.N.Y. Mar. 30, 2026) (agreeing with Saedi when applying California law); *Nicole Reisberg et al. v. Renaissance Learning, Inc.*, No. 25-01379, 2026 WL 1048242, at *4 (C.D. Cal. Feb. 17, 2026) (agreeing with *Saedi* when applying Wisconsin law). One of these courts also directly rejected the assertion that the "vast majority" of district courts had interpreted California law as E.H. does in this case. *See Camm*, 2026 WL 861670, at *10. As that court explained, viable claims about tracking technology have generally targeted the creators of the tracking tools—the Googles and Facebooks of the world—the third-party outsiders who collect information from exchanges between others, not the website operators themselves. *See id.* (distinguishing *Silver v. Stripe Inc.*, No. 20-8196, 2021 WL 3191752 (N.D. Cal. July 28, 2021); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 799–800 (N.D. Cal. 2022); and *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1257 (N.D. Cal. 2024)); *see also, e.g.*, *In re Facebook*

*Tracking Litig.*, 956 F.3d at 596–97, 601–06. When plaintiffs have sued the websites' operators, by contrast, district courts have usually assumed that there has been an intrusion without questioning whether that was a reasonable assumption to make, ostensibly because the parties did not raise that issue. *See Camm*, 2026 WL 861670, at *10 (citing *Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 973–74 (S.D. Cal. 2023); *Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023); and *St. Aubin v. Carbon Health Techs., Inc.*, No. 24-667, 2024 WL 4369675, at *11-13 (N.D. Cal. Oct. 1, 2024)).

A federal district court's goal in exercising its jurisdiction over a state law claim is to "approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Murray v. BEJ Mins., LLC*, 924 F.3d 1070, 1071 (9th Cir. 2019) (quoting *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001)). "If the state's highest appellate court has not decided the question presented," *id.*, and if there is no relevant precedent from the state's intermediate appellate court, *see Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007), then the federal court must "predict how the state's highest court would decide the question," *Murray*, 924 F.3d at 1071.

The parties have not cited (and the Court has not found) any directly controlling opinions by California's appellate courts. In the absence of that controlling authority, the district courts' decisions in *Saedi* and *Camm* are the most persuasive and thorough predictions of the California Supreme Court's likely reasoning with respect to the common law of intrusions upon seclusion. A common law claim for unlawful intrusion upon seclusion is not viable if the plaintiff intended for the defendant to receive the allegedly private information. This conclusion follows from the basic principles that the California Supreme Court reviewed in *Hernandez*, cited above. *See* 47 Cal. 4th at 86–88. The common law claim is not just about what a reasonable person would find offensive. *See Hernandez*, 47 Cal. 4th at 86. It is also about an intrusion, some wrongful access to a physical place, to a conversation, or to data. *See id.* at 286–87. It is about the "personal control" that the law recognizes in one's "autonomy, dignity, and serenity." *Id.* People who voluntarily disclose private information retain the autonomy, dignity, and serenity they

choose to retain. The defendant's later disclosure of the plaintiff's private information may run afoul of a different prohibition, but obtaining or receiving that information was not an intrusion or breach in the first place.

California state's courts have drawn on the Restatement of Torts to define the state common law, *see, e.g.*, *id.* at 286, and the Restatement makes a similar point. For example, according to a comment and illustration in the relevant section, a news reporter would be liable if he went to a hospital and took a picture of a woman with a rare disease if she had objected and ad previously refused his request to speak with him. *See* Restatement (Second) Torts § 652B, cmt. b, illus. 1). This would be an intrusion into the woman's privacy within the hospital room. *See id.* Another illustration shows how a non-physical intrusion might work: a hypothetical private detective would be liable if he went to a bank with a forged court order and used the forgery to persuade a teller to show him his target's accounts. *See id.* cmt. b, illus. 4. The detective would have overstepped a virtual line by intruding into private financial information. *See id.* In sum, as the Restatement puts it in a comment, a "defendant is subject to liability . . . only when he has intruded into a privacy place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person of affairs." *Id.* cmt. c. E.H.'s common law claim is not viable, at least not as currently framed.

The constitutional claim is different. Although a constitutional privacy claim may be "largely parallel" to a common law claim in many cases, *Hernandez*, 47 Cal. 4th at 288, and although the elements of both claims are indeed "similar," *In re Facebook Tracking Litig.*, 956 F.3d at 601, they are not identical, and it is not clear that they should meet the same result in this case.

The constitutional privacy claim is based on Article I, section 1 of the California Constitution, which "is an enumeration of the 'inalienable rights' of all Californians," including "privacy." *Hill*, 7 Cal. 4th at 16. In full, it states, "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, § 1. The state constitution does not define the word "privacy," it does not

"explain its relationship to other rights or interests," and it does not "specify against whom the right of privacy is to be safeguarded." *Hill*, 7 Cal. 4th at 16.

Interpreting that right has sometimes been a difficult and contentious task, among other reasons because of its origins: it was added to the state constitution by a 1972 ballot initiative. *See id.* at 15. The state supreme court has said that constitutional provisions added by ballot initiatives are "to be interpreted and applied in a manner consistent with the probable intent of the body enacting it: the voters of the State of California." *Id.* at 16. One voter might have had a very different than other, but many of them probably read the arguments for and against the initiative in the official ballot initiative pamphlet, so those arguments are one type of evidence that a court can rely on when it attempts to discover the voters' intent. *See id.*

The pamphlet for the 1972 privacy initiative included arguments in favor of its adoption, and within those arguments was this passage:

> This amendment creates a legal and enforceable right of privacy for every Californian. The right of privacy prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. The proliferation of government and business records over which we have no control limits our ability to control our personal lives. . . . Each time we apply for a credit card or a life insurance policy, file a tax return, interview for a job, or get a drivers' license, a dossier is opened and an informational profile is sketched.

*Id.* at 17 (other alterations and emphasis omitted) (quoting Ballot Pamphlet, "Proposed Amendments to California Constitution with Arguments to Voters," Gen. Elec. at 26–27 (Nov. 7, 1972)).

In other passages, proponents made uncannily prescient warnings about "computer stored and generated 'dossiers,'" "'cradle-to-grave' profiles of every American," and the large-scale "'collecting and stockpiling'" of personal information. *Id.* at 21 (quoting Ballot Pamphlet at 27). Elsewhere they argued similarly that their proposal would "prevent misuse" of legitimately collected information "for unauthorized purposes." *Id.* at 22 (emphasis omitted) (quoting Ballot Pamphlet at 28). The state supreme court therefore decided in *Hill* that Article I, section 1 protects the interest "in precluding the dissemination or misuse of sensitive and confidential

information." *Id.* at 35.

With that history and holding in mind, it is not difficult to see why the California Supreme Court would probably reach a different result about E.H.'s constitutional claim than it would about her common law claim. Voters adopted the constitutional privacy protection based on warnings about digital stockpiles, dossiers, and personal profiles. They voted to add a privacy protection to the state constitution after reading arguments about how it would prevent the misuse of information that had been collected for legitimate purpose. And based on this history, the state supreme court has said that the constitutional privacy protection encompasses a person's interest in preventing disseminations and misuses of sensitive and confidential information by private businesses. *See Hill*, 7 Cal. 4th at 20, 32–37.

It is therefore plausible to infer that E.H. could ultimately prove each of the three elements of a constitutional privacy claim. She could show that LifeLong misused or wrongfully disseminated the sensitive information it collected by forwarding that information to Google and Facebook without telling her or asking permission. *See id.* at 35–36 (element one). It is also plausible to infer that she had a reasonable expectation that LifeLong would not forward information about her pregnancy, whether it was wanted or expected, and her interest in LifeLong's services to Google or Facebook or anyone else whose goal was to use her information for their own purposes. *See id.* at 36–37 (element two); *see also, e.g.*, *In re Facebook Tracking Litig.*, 956 F.3d at 602–05 (finding a complaint adequately pleaded a legitimate expectation of privacy under California law in similar circumstances). Finally, it is plausible to infer that she could show this invasion of her privacy was serious, given the sensitive nature of adoptions and unexpected or unwanted pregnancies. *See Hill*, 7 Cal. 4th at 37 (element three). For these reasons, claim one is dismissed with leave to amend, but the motion to dismiss claim eight is denied.

## II. Breach of Confidence (Claim 2)

For claim two, a common law claim for breach of confidence, the parties agree that there are four elements. First, the plaintiff "conveyed confidential and novel information to the defendant." *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1227 (9th Cir.

1997) (citation and quotation marks omitted). Second, the defendant knew "the information was being disclosed in confidence." *Id.* Third, there was "an understanding between the defendant and the plaintiff that the confidence be maintained. *Id.* And fourth, "there was a disclosure or use in violation of the understanding." *Id.*

The complaint's allegations "state a claim to relief that is plausible on its face" against this standard. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). First, E.H. alleges she conveyed confidential information about her pregnancy and her interest in adoption services to LifeLong. (*See* Doc. 19 at 21–33.) Second, she alleges that LifeLong knew she intended for this information to remain confidential. (*See id.* at 33, 37–38.) Third, similarly, she alleges that she and LifeLong understood that her interest in LifeLong's services, her pregnancy, and its circumstances would not be disclosed to any third parties "other than as necessary" to fulfill their requests. (*See id.*) And fourth, she alleges that LifeLong disclosed data about her visit to Facebook and Google. (*See id.* at 46–47.)

LifeLong argues that the data in question was not truly confidential, but rather "standard website analytics" about "ordinary interactions" with a "public website." (Doc. 26, at 21.) These arguments downplay the sensitivity and personal nature of the data LifeLong allegedly collected and transmitted, when at this early point in the case the Court must instead draw reasonable inferences in favor of E.H. *Boquist*, 32 F.4th at 773. It is reasonable to infer that a person would think an otherwise private interaction with an adoption website would remain confidential. An interest in adoption can imply that a person is pregnant and that the pregnancy is unwanted. These are private, potentially embarrassing, isolating facts. That is a matter of "common sense." *Iqbal*, 556 U.S. at 679.

LifeLong argues similarly that it is implausible to infer that E.H. believed her data would remain confidential and that there was any understanding to that effect. (*See id.* at 22–23.) It is again reasonable to draw the necessary inference in her favor. LifeLong's business depends at least in part on an implicit understanding with the people who visit its website. Many people would probably choose not to visit LifeLong's website at all if they knew that LifeLong would forward revealing "analytical data" about their clicks and other actions to companies in the

business of personalized advertisements, like Facebook and Google. E.H.'s allegations about LifeLong's terms of service lend support to this position. (*See* Doc. 26 at 37–38.) The motion to dismiss claim two is denied.

**III. Negligence (Claim 4)**

E.H.'s next claim is a common law claim for negligence. To prevail on a claim for negligence under California law, E.H. must ultimately prove that LifeLong breached a duty of care and caused damages. *See Vasilenko v. Grace Fam. Church*, 3 Cal. 5th 1077, 1083 (2017).

Starting with the required duty, E.H. alleges LifeLong "had a duty of care to use reasonable means to secure and safeguard" the records of her visit "from unauthorized disclosure to third parties, including Google and Facebook." (Doc. 19 at 49.) She relies on section 1714 of the California Civil Code. (Doc. 31 at 20.) Section 1714 provides that "[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." Cal. Civ. Code § 1714(a). E.H. also cites decisions by other California federal district courts, which have denied motions to dismiss in the face of similar allegations. *See, e.g.*, *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1016 (N.D. Cal. 2024) (denying motion to dismiss based on allegations that the defendant "owed [the plaintiffs] a duty to exercise reasonable care to protect their confidential financial information from unauthorized disclosure"); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) ("[T]he plaintiffs allege that they entrusted Facebook with their sensitive information, and that Facebook failed to use reasonable care to safeguard that information, giving third parties access to it without taking any precautions to constrain that access to protect the plaintiffs' privacy, despite assurances it would do so.").

LifeLong argues again that the information at issue is not the type of "sensitive personal and financial information" that has supported viable negligence claims in the past. (*See* Doc. 40 at 15.) But again, when reasonable inferences are drawn in favor of E.H., as they must be for now, a negligence claim is plausible. A person's interest in adoption services in reaction to an unplanned pregnancy is quite plausibly "sensitive and personal," just like the "employment information, bank account information, citizenship status," and other information that LifeLong

cites as examples of actionable data. (*See id.*)

The remaining elements of E.H.'s negligence claim do not create any difficult problems. E.H. alleges LifeLong breached its duty to prevent unauthorized disclosures to third parties, and she alleges this breach harmed her, including by depriving her of privacy and causing emotional distress. (*See, e.g.*, Doc. 19 at 5.) These types of harms can support a negligence claim under California law. *See, e.g.*, *Toy v. Life Line Screening of Am. Ltd.*, No. 23-04651, 2024 WL 1701263, at *4 (N.D. Cal. Mar. 19, 2024) (denying motion to dismiss negligence claim based on disclosure of records showing the plaintiff used the defendant's website to order health tests and view test results); *Doe v. N. Cal. Fertility Med. Ctr.*, No. 22-01861, 2024 WL 246178, at *5 (E.D. Cal. Jan. 23, 2024) (denying motion to dismiss negligence claim based on disclosure of information about fertility treatments). The motion to dismiss claim four is denied.

**IV. Unjust Enrichment (Claim 6)**

The Court construes E.H.'s "unjust enrichment" claim (number six) as an equitable claim for restitution of a benefit unjustly conferred. *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).

LifeLong originally argued that courts do not award restitution in cases like this one unless a plaintiff shows she had a "reasonable expectation of payment for the benefit conferred." (Doc. 26 at 30.) It also argued that no allegations in the complaint could show the E.H. expected payment or that "website operators regularly pay website visitors for the same type of information" at issue in this case. (*Id.* at 30–31.) In opposition, E.H. cites cases in which other California district courts have permitted similar claims for unjust enrichment to move forward. (*See* Doc. 31 at 23–24.) LifeLong contended in its reply these cases are distinguishable based largely on its theory that the information at issue in this case is not as valuable or as sensitive as the types of information at issue in the cases E.H. cites. (*See, e.g.*, Doc. 40 at 18.) The Court has explained in the sections above that E.H.'s complaint permits the plausible inference that the information in question was sufficiently sensitive and confidential. She alleges as well that its disclosure benefitted LifeLong, as evidenced by the value of the services that LifeLong allegedly received from Google and Facebook in exchange for enabling and configuring the disputed

tracking tools as it did. (*See, e.g.*, Doc. 19 at 35.) These are factual allegations, and at this point, the Court must assume they are true.

In reply, LifeLong pivots to broader theories about the viability of unjust enrichment claims. (*See* Doc. 40 at 16–19.) It could have raised these arguments in its motion, but did not. The Court will not consider them now. *See, e.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *Pratt v. Comm'r of Soc. Sec.*, No. 22-02152, 2025 WL 1446392, at *3 (E.D. Cal. May 20, 2025) ("A reply brief is not the time to raise new arguments."). The motion to dismiss claim six is denied.

**V. ECPA and CIPA (Claims 7 and 12)**

The last two claims in dispute are numbers seven and twelve, which are similar claims under two federal and a state privacy laws. The federal law, the Electronic Communications Privacy Act (ECPA), prohibits the intentional disclosure or use of "the contents of any . . . electronic communication" by someone who knows or has "reason to know" that the interception was obtained in violation of the same law. The ECPA also "includes a private right of action" to enforce these provisions. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117 (9th Cir. 2020) (citing 18 U.S.C. §§ 2511(1)(d), 2520). But in general, it imposes no liability on those who are parties to the "intercepted" communication. 18 U.S.C. § 2511(2)(d). LifeLong argues that it was a party to in the allegedly intercepted exchange and therefore cannot be liable. (*See* Doc. 26 at 31.)

E.H. does not dispute that LifeLong was a party to the intercepted communication. She relies on an exception to the general rule against party liability. (*See* Doc. 31 at 24–26.) A party to an intercepted communication can be liable under the ECPA if the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). "This criminal or tortious purpose must be separate and independent from the act of the recording." *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022). "[T]he focus is not upon whether the interception itself violated another law; it is upon whether the

purpose for the interception—its intended use—was criminal or tortious." *Sussman v. Am. Broad. Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999). E.H. argues her allegations permit a plausible inference of LifeLong's liability because it recorded data about her visit (i.e., it "intercepted" an electronic communication in the terms of the ECPA) with an independently tortious purpose (i.e., forwarding the data to Google and Facebook in breach of her confidences). (*See* Doc. 31 at 24–25; *see also* Doc. 19 at 56.)

Federal courts have struggled to apply this so-called "crime-tort" exception consistently in similar cases. Some have held that allegations about similar tracking tools cannot support a viable claim because the "interception" is legally and practically indistinguishable from the allegedly tortious "transmission." *See, e.g.*, *Nienaber v. Overlake Hosp. Med. Ctr.*, No. 23-01159, 2025 WL 692097, at *13 (W.D. Wash. Mar. 4, 2025); *Doe v. Kaiser Found. Health Plan, Inc.*, No. 23-02865, 2024 WL 1589982, at *10 (N.D. Cal. Apr. 11, 2024). Others have been less concerned with the distinction between interception and transmissions provided, of course, that there are plausible allegations to support a theory that the defendant intended to do something illegal or tortious with the data. Many cases concern alleged violations of the federal Health Insurance Portability and Accountability Act (HIPAA), for example. *See, e.g.*, *Castillo v. Costco Wholesale Corp.*, No. 23-01548, 2024 WL 4785136, at *5–6 (W.D. Wash. Nov. 14, 2024); *Gay v. Garnet Health*, No. 23-06950, 2024 WL 4203263, at *3–4 (S.D.N.Y. Sept. 16, 2024). Still others have decided that the crime-tort exception is no help to a plaintiff whose allegation is that the defendant was simply hoping to market itself, to find new customers, not to do some injurious or harmful thing. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022); *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 518–19 (S.D.N.Y. 2001). But again, this reasoning has garnered inconsistent support. As one district court wrote, "it would be odd to exclude an otherwise criminal or tortious act solely because it was also motivated by financial gain." *Stein v. Edward-Elmhurst Health*, No. 23-14515, 2025 WL 580556, at *6 (N.D. Ill. Feb. 21, 2025), *motion to certify appeal granted*, 2026 WL 594752 (N.D. Ill. Mar. 3, 2026).

The decision is complicated further by the reality that in many cases, district courts have had to make a decision with very limited information about the disputed tracking tools. *See, e.g.*,

*Nienaber*, 2025 WL 692097, at *13; *Kurowski v. Rush Sys. for Health*, No. 22-5380, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023). The plaintiffs in these cases are ordinarily outsiders without "direct access to what occurs in the background" of the defendant's website or within a pixel's source code. *Kurowski*, 2023 WL 8544084, at *3. The technology itself can also be difficult to understand and describe accurately, and they may change or differ from one case to the next, hampering the sorts of comparisons and analogies that can create a useful body of persuasive authority.

These circumstances generally counsel in favor of caution against broad legal pronouncements, especially at the pleadings stage. They also weigh in favor of leniency for plaintiffs with only limited access and understanding before discovery, and precision in describing the complaint's allegations. *See id.* When E.H.'s allegations are taken in the most favorable light and with these precautions in mind, they describe the following sequence of events:

(1) LifeLong installed and configured pixels created by Google and Facebook on its website. (Doc. 19 at 21, 32–33.) As configured, the pixels were set to collect and transmit more data about the people who used the website than the pixels would have collected if LifeLong had left them in their default state. (*Id.* at 32–33.)

(2) E.H. visited LifeLong's site and began interacting with it. (*Id.* at 6, 21.)

(3) The pixels on LifeLong's site requested information from tracking cookies previously saved on E.H.'s device, and they recorded data about her screen resolution, time zone, language, operating system, web browser, and other tidbits that might help to identify her later on. (*Id.* at 17–18.)

(4) E.H. used LifeLong's website to request a consultation about adoption services based on an unplanned pregnancy. (*See id.* at 6.)

(5) The pixels on LifeLong's website recorded E.H.'s request. (*See id.* at 21–33.) The recorded data included enough information to show that E.H. had requested an adoption consultation due to an unplanned pregnancy. (*See id.*) The pixels transmitted this information to Google and Facebook. (*See id.*) They also

transmitted the unique identifying information that they had collected about E.H. and her device. (*See id.*) This process occurred several times, i.e., once after every time E.H. took some action that the pixels were configured to record. (*See id.*)

(6) Google and Facebook collected the forwarded information and aggregated it with other information about E.H. that they had gathered from other sources. (*See id.* at 18–19.) Her advertising profile thus came to include data suggesting to Google, Facebook, and others that she was pregnant, that the pregnancy was unwanted, and that she was considering an adoption after childbirth. (*See id.* at 11–12.)

(7) E.H. immediately began to see advertisements for adoption services when she browsed the internet. (*See id.* at 6.) The implication is clear: Google or Facebook or both companies had used the forwarded information to sell targeted advertisements to other entities who wanted to offer their adoption services to her. (*See id.* at 6, 9–11.)

If E.H. ultimately proved at trial that this is what happened when she visited LifeLong's website—as the Court must assume she would do at this stage—then it is plausible that LifeLong would be liable for recording information with a tortious purpose in violation of the ECPA. In the terms of that statute, the "interception" was the recording of the electronic "conversation" between E.H. and LifeLong's on its website. E.H. told LifeLong that she wanted to talk about adoption as a result of an unplanned pregnancy. LifeLong had arranged ahead of time to use Google's and Facebook's tracking software to secretly "record" this interaction. The tracking software that LifeLong used recorded who E.H. was and the data she sent. It is not too different from a quainter story that might have played out a few decades ago, if one person bought and used a tape recorder as part of a plan to memorialize a phone call with another. But then, at LifeLong's request (i.e., as configured by LifeLong), the software transferred the collected information to Google and Facebook. That act, the "disclosure," was independent from the "interception" in the sense that it was a distinct act from recording what E.H. did on the website. Just as recording a phone call would be different from mailing the recording to some third party,

preserving analytical data for internal use is different from forwarding that data to a third party aggregator. Finally, this disclosure was "tortious" in the sense that it was a breach of confidence in violation of California common law, just like it would be a breach of confidence to mail a recording of a phone call after taping it.

The story is the same even if one assumes that LifeLong was motivated primarily by financial purposes. In the language of the ECPA, E.H. alleges LifeLong "intercepted" its "electronic communication" with her "for the purpose of committing" the "tortious act" of disclosing that recording to a third party. 18 U.S.C. § 2511(1), (2)(d). That "tortious act," the disclosure, would be the "purpose" of the alleged interception no matter whether it was part of a plan to find customers and make money. For this reason, the Court is unpersuaded by LifeLong's argument that the agency lacked the necessary tortious or criminal purpose. (*See* Doc. 26 at 34.)

LifeLong argues in the alternative that the information it transmitted was "record information" that cannot support a claim under the ECPA. (*See* Doc. 26 at 35–36.) Its argument is based on a distinction the Ninth Circuit first made clear in 2014. *See In re Zynga Priv. Litig.*, 750 F.3d 1098 (9th Cir. 2014). Congress used the word "contents" in the relevant sections of the ECPA. *See id.* at 1105. It is unlawful to disclose or use "the contents" of an "electronic communication." 18 U.S.C. § 2511(1)(c). In *Zynga*, the Ninth Circuit distinguished the "contents" of a communication from "record information" about it. *See id.* at 1106. The "contents" is "the intended message conveyed by the communication." *Id.* "Record information" is information about the message's "characteristics," such as the speaker's name, address, or account number or the length or date of a call. *See id.* Disclosing this type of "record information," then, is not unlawful.

The Ninth Circuit decided that the information in *Zynga* was record information, not contents. *See id.* at 1107. It included a user's unique ID number or account name and the address of the webpage. *See id.* This information might have allowed someone to identify the user, but that is a common feature of the sort of record information that accompanies any transmission, and it was not the "intended message" that the user had conveyed. *See id.*

The Circuit rejected the plaintiff's argument that a web address is "content" whenever it

might divulge a person's views or characteristics. *See id.* at 1107–08. The plaintiffs had offered the example of a website address for a gay support group. *See id.* at 1108. A closeted Facebook user's visit to a gay support group page could reveal personal and potentially embarrassing information about that user. *See id.* The Circuit was not persuaded. In contrast with concepts of privacy and reasonableness under the Fourth Amendment, the question in ECPA disputes is not whether information is private, but instead whether it represents the contents of a message or merely a record of it. *See id.* Records, in other words, can be records even if they are embarrassing or revealing. But even if an analogy to the Fourth Amendment were useful, the Circuit was unpersuaded that it would help to show that a web address or user ID could qualify as contents. *See id.* Even in Fourth Amendment cases, it is not a search for an officer to examine the outside of an envelope. *See id.*

LifeLong argues that this reasoning shows why the data in this case was "record information," even if it was potentially revealing or embarrassing. LifeLong's position takes the Circuit's reasoning too far. The Circuit made clear in *Zynga* that a given category or type of data (a web address, for example) that is record information in one case might be contents in another case, depending on what it contains. A web address may very well reveal the substance of a message and thus the contents of a communication. *See id.* at 1108–09 (citing *In re Application of U.S. for an Ord. Authorizing use of A Pen Reg.*, 396 F. Supp. 2d 45, 49 (D. Mass. 2005)); *see also In re Facebook Tracking Litig.*, 956 F.3d at 604–05.

E.H.'s allegations about LifeLong's website permit a plausible inference of its liability for disclosing or using the "contents" of a message in violation of the ECPA. She alleges the pixels were configured to transmit information showing that she requested a consultation about adoption due to an unplanned pregnancy. (*See* Doc. 19 at 6.) Taken in a favorable light, this allegation could show LifeLong reconveyed a message: "I am pregnant, the pregnancy was unplanned, I am considering an adoption, and I would like to talk about my options." District courts have decided that similar information is "contents" in similar cases. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022); *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022).

In claim twelve, E.H. alleges LifeLong's actions violated the California Invasion of Privacy Act (CIPA) as well. The "CIPA prohibits any person from using electronic means to 'learn the contents or meaning' of any 'communication' 'without consent' or in an 'unauthorized manner.'" *In re Facebook Tracking Litig.*, 956 F.3d at 607 (9th Cir. 2020) (quoting Cal. Pen. Code § 631(a)). Like the federal ECPA, the CIPA contains "an exemption from liability for a person who is a 'party' to the communication, whether acting under the color of law or not." *Id.* (citing *Warden v. Kahn*, 99 Cal. App. 3d 805, 811 (1979)). Courts commonly rely on the same principles to analyze claims under the ECPA and CIPA *Id.*; *see also, e.g.*, *B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056, 1065 (C.D. Cal. 2024). LifeLong accordingly relies on the same arguments in its motion to dismiss both claims. (*See* Doc. 40 at 27–28.) The motion to dismiss the CIPA claim is therefore denied for the reasons above.

**CONCLUSION**

The motion to dismiss (Doc. 26) is **GRANTED IN PART** with leave to amend in part. Claim 1 is dismissed with leave to amend. Claims 3, 5, 9, 10, and 11 are dismissed without leave to amend. The motion is otherwise denied. Any second amended complaint must be filed within thirty days.

IT IS SO ORDERED.

Dated: _July 24, 2026_

Jennifer L. Thurston
UNITED STATES DISTRICT JUDGE